## MORRIS–POSTON COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 5434.

Circuit Court of Appeals, Sixth Circuit.

June 28, 1930.

D. A. Gaskill and J. C. Fisher, both of Cleveland, Ohio (Charles P. Hine, of Cleveland, Ohio, on the brief), for petitioner.

J. H. McEvers, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, C. M. Charest, and J. S. Franklin, all of Washington, D. C., on the brief), for respondent.

Before DENISON, Circuit Judge, and COCHRAN and JONES, District Judges.

DENISON, Circuit Judge.

For many years prior to 1921, the petitioner had been in the business of buying and selling coal. It regularly kept its books upon a system which, in its income tax reports, it described as the cash receipts and disbursement system. The accounting year ended December 31. All expenses of operation outstanding at that date were assembled and paid within the next few days and written up as of December 31. Invoices for coal sold (the sole receipts excepting interest) were commonly paid early in January and entered on the December receipts. The pay rolls owing to the miners at the end of the year and the store balances then due from them were also closed up during early January and included in the December accounts. Any pre-January invoices which remained unpaid on January 20, and the interest accrued up to January on some Liberty bonds in the treasury, were entered as assets. The pre-January obligations of the company, if any, which remained unpaid on January 30,

were entered as liabilities. While it is not important that this system should have a name, it was evident that it was, in the main, upon the cash basis, but was modified in some particulars and to some extent by items accrued and unpaid. It was the system regularly employed, and it unquestionably truly reflected annual income.

On April 1, 1921, the company discontinued the mining business and leased its entire properties to another for a term of years. The lessee agreed to pay, on July 1, $54,000 as rental for the three months before that date, and on the 1st day of each January and July thereafter the sum of $108,000 as rental for the preceding six months. This was to continue for several years, after which the semiannual rental would be increased. The lessee gave security to insure performance. The April-July rental, paid July 1, was included in the income tax return for the year 1921; the July-January rental, actually paid after some delay in January, 1922, was not included, but was reported in the 1922 income. The Commissioner insisted that this item of $108,000 was part of the 1921 income, and assessed the tax thereon. The Board upheld the Commissioner, and this review was taken.

The fundamental contention of the Commissioner is that the petitioner had been keeping its books upon the accrual system; that, on April 1, and without the permission of the Commissioner, a change in this system to the cash method could not be allowed—both because no advance permission had been granted under the regulations and because the judgment of the Commissioner upon such matters is discretionary.

■ The law plainly recognizes that the selection of the system or method of keeping his books is primarily for the taxpayer. It further recognizes that the cash receipts and disbursements during the period furnish the normal or prima facie correct test for computing income. The Revenue Act 1921, § 212 (b), 42 Stat. 237, provides that the computation shall be "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer"; but, "if the method employed does not clearly reflect the income," the Commissioner may adopt and require some other method, which in his opinion does clearly reflect the income. Section 213 (a), 42 Stat. 238, says that items of income should be included in the report for the taxable year in which they were received by the taxpayer, unless, under section 212 (b), they were to be properly accounted

for in a different period. Hence the right of the commissioner to reject the taxpayer's theory of income in this kind of a case stands upon the Commissioner's preliminary finding that the method employed by the taxpayer did not clearly reflect the income. If it did, the report should have been accepted as the basis of assessment; and it is not denied that the report tendered did clearly reflect the income, unless for the fact that it contemplated assigning to the year 1922 this income, which was in fact received in that year.

The Commissioner rests his action largely upon his conclusion that this taxpayer, during the year, changed its method of accounting. We think the facts do not support this conclusion. As to all the transactions customary before April 1, to the extent that these transactions continued in a modified and winding up way, there was no change in the method of bookkeeping. Then a new kind of business was beginning and a new kind of income was in contemplation. This kind of income had never been handled by the method of bookkeeping in former use, because such type of income had never existed. What the company had formerly received, in exchange for its coal coming out of the ground, had been short-time invoices in relatively small amounts against responsible persons; the debts were subject to no contingencies; and experience showed that there was little delay and little loss. The sales were characteristically not very different from cash sales; and, even though they had not been paid, to take them into account at the end of the year as income for the year was natural. The new rental involved a different set of conditions. There was one item of large amount. Its maturity and payment were postponed (partially) for six months; according to familiar principles of real estate law (In re Roth & Appel [C. C. A. 2] 181 F. 667, 669, 31 L. R. A. (N. S.) 270), it did not until its maturity accrue so as to have existence separate from the realty; a part of the consideration for it might be long postponed through the exercise of the lessee's option to take less coal during the early period and more during a later period; it was attended by all the contingencies which affect future rentals—eviction by superior title, inability to get out coal through some fault of the lessor, financial embarrassment of the lessee, and so on through a long category.

■ There are abundant reasons why the determination not to regard such a rental as income until it should be received might be

not only made in good faith but might be so prudent that any other conclusion would be reckless. It seems clear to us that this item of expected income was not so necessarily apportionable to 1921 as to justify the inference that its exclusion gave an untrue reflection of income for that year. It seems equally clear that a taxpayer who has customarily employed a combination of cash and accrual methods, classifying his items in accordance with his judgment, does not change his method of bookkeeping within the contemplation of the Regulation 62, art. 23 merely because, having vitally changed the character of his business and created income of a nature never before entered on the books, he classifies that income, in accordance with his honest judgment and not imprudently, as deserving treatment on a cash basis.

It is true that, in this instance, the contingencies of the rental had disappeared, because it had been paid in January, 1922; and true, also, that there was security which made the payment always less contingent than it would otherwise have been; but security for a future payment does not transform it into present income; and, just as the finding of contraband upon the premises searched does not make a search reasonable when it was without sufficient preliminary cause, so the payment of a rental when due does not show that it had been, during the earlier period, definite and certain income.

The situation is well illustrated by what actually happened: During the latter part of 1921—as we judicially know from many cases—the mining business became much depressed; this produced with petitioner during that very time great uncertainty and anxiety as to whether the next January payment would be made; and during the next two or three years the payments were delayed one or two years after the time fixed, and eventually there was revision of the lease and radical reduction in the rental, as an alternative to taking the property back. Although the prohibition of changing methods applies only to changes made during the one year, the Commissioner has insisted that the accrual theory be carried forward into every year following 1921, and taxes have thus been assessed against petitioner for income not received during the year and not certain ever to be received—excepting as the security might turn out to be sufficient. Against this method of taxation the taxpayer has no remedy except to claim a loss in some future year, and this claim may be entirely unavailable if there is no sufficient gross income against which it may be offset.

It is said that petitioner's method leaves a hiatus in its income from July 1, 1921, to January 1, 1922. To say this is only to make the main contention in other words. Petitioner's income under the old business ceased April 1; under the new business it had additional income July 1. It had no more income until January—unless it was compelled to adopt the accrual method. The taxpayer had been receiving, as its income, pay for its coal, in cash from month to month during each half year; excepting for such unknown and probably small part as was not received before January 20; from July, 1921, to January, 1922, this income ceased to be received; there was, in truth, a hiatus; why not acknowledge it instead of covering it up by a fiction?

In our judgment, even if there was a change in the bookkeeping system during the year, that fact was given undue force. The outstanding controlling fact is that petitioner's going business, with its established customs of sale and methods of bookkeeping, ended on April 1. It then engaged in a new business—with the same capital, it is true—but of a different character, with different prospective income and with different risks and contingencies. For the new business it adopted an appropriate method of income computation and of tax reports which, from that time on and from year to year, would truly reflect the annual income. The facts that the change occurred during the calendar year and that there was a rather negligible overlapping of the old and the new do not affect the real nature of what happened. Regulation 62, art. 23, should not, we think, be construed to apply to such a situation; if so construed, and carried along with subsequent years as it has been, it would come dangerously near to creating income when there was none—and regulations cannot do that.

To say, as the Board did, that this rental must be assigned to 1921 because it was the effect of the 1921 disbursements, involves a mistake of fact and one of law. As to the fact: There were no production expenses in the second half of 1921; the only expenses were $2,000 to $2,500 for salaries and lawyers' fees; these had no relation to the rental. As to the law: If the reason assigned is sound, it would require accounting and income computations upon the accrual basis in all cases and at all times where there are accruals.

Aluminum Co. v. Routzahn (C. C. A. 6) 31 F.(2d) 669, and the cases there cited are distinguishable. That case held only that, when the general bookkeeping was all upon the accrual basis, one of the regular expenses of operation—a tax—could not be cut out from other regular expenses attaching to that year's business and put by itself upon the cash basis.

Nor do we find in the other authorities cited by the respective counsel anything particularly helpful. The facts here are undisputed. The only question is whether the report truly reflected the taxpayer's income for 1921; and we think it did. The order of the Board must be reversed.